# EXHIBIT A

Case 7:17-cv-02255-VB   Document 1-1   Filed 03/29/17   Page 1 of 10

# PRIVATE LABEL AGREEMENT

THIS AGREEMENT, dated as of the 5th day of March 2016 by and between Purine Pharma LLC, a Delaware limited liability company (hereinafter referred to as "Purine"), with a principal place of business at 5 County Route 42, Massena, NY 13662, and We Care Distributor Inc., a Tennessee corporation, with a principle office located at 5764 Old Hickory Blvd, Hermitage, TN 37076 (hereinafter referred to as "We Care").

## W I T N E S S E T H:

WHEREAS, Purine desires to manufacture and label certain so-called "private label" products, under the trademark(s) "We Care" and "WeZen" or such other trademark(s), trade name(s) or service mark(s) (collectively, the "We Care Trademarks") as the parties hereto shall agree to in writing by this Agreement and/or any authorized and signed purchase order between the undersigned parties for manufacture of such products (hereinafter referred to as a "Purchase Order"); and

WHEREAS, We Care desires to control the quality and distribution of any products manufactured and sold by Purine under any We Care Trademark.

NOW, THEREFORE, in consideration of the above and other valuable consideration, the parties hereto hereby agree as follows:

RIGHT TO MANUFACTURE

    1.  We Care hereby authorizes Purine to label Purine products requested by We Care as set forth in Schedule A attached hereto (as amended from time to time by the parties such products referred to as "We Care" or "WeZen" products or the "Products") with the We Care and WeZen brand packaging and labels.

PRODUCT SPECIFICATIONS

    2.  Purine warrants and agrees that all We Care or WeZen products manufactured pursuant to this Agreement or pursuant to any Purchase Order shall be manufactured in accordance with any product specifications, directions and processes furnished in writing to Purine by We Care or its representatives or agents, and in accordance with the product specifications, directions and processes that are supplied by Purine to We Care and approved in writing by We Care. Wherever the words "product specifications" are used in this Agreement, they are deemed to include, but are not limited to, package artwork, trade dress, general design and appearance of the product. Purine shall promptly notify We Care in writing in the event that it becomes aware that any of the product specifications supplied by We Care conflict with any applicable law or have a potential for trademark or trade dress infringement.

COMPLIANCE WITH LAWS AND REGULATIONS

      3. It shall be the responsibility of Purine to ensure that the manufacturing by Purine of all Products and their respective product specifications shall comply with all applicable federal, state and municipal statutes, ordinances, rules, regulations, requirements and the like, including, but not limited to, the Federal Food, Drug and Cosmetic Act, the Consumer Product Safety Act, the Federal Hazardous Substance Labeling Act, and any other similar laws.

PACKAGING AND LABELING

      4. Purine agrees that all Products that it manufactures shall have legible expiration date and lot number coding on each individual package, item description and any other information required to conform to applicable federal, state and municipal laws on the shipping carton. The container for all Products shall be filled as full as practicable and, in any event, shall comply with all applicable labeling weights and measures laws, ordinances, rules and regulations.

PRODUCTION STANDARDS

      5. All Products shall be prepared, processed and packaged under modern sanitary conditions, and by such methods that will reflect good standards of workmanship and quality in the finished product. Further, Purine agrees its facilities shall be maintained in accordance with all statutes and regulations governing sanitation conditions under which products must be prepared, processed, packaged and, in general, be maintained in accordance with Good Manufacturing Practices.

QUALITY CONTROL

      6. The plants and processing facilities used by Purine in the preparation and manufacturing of Products shall be open for inspection to authorized personnel of We Care at all reasonable hours with reasonable notice from We Care so as not to interfere with the regular operations and quality assurance and quality controls at Purine. Finished product analysis for each production code of all Products shall be available upon request by We Care quality assurance personnel.

Without limiting the foregoing, Purine shall be responsible for the associated fees of the service listed below:

-Quality Assurance (QA) testing by, for any or all the circumstances listed below:

-Testing for cause as required by the appropriate regulatory agency in the event of recalls, adverse events, non-compliant, regulatory warning letters, and high rates of returns and/or customer complaints.

In the event any Product fails such quality assurance testing (i.e. does not meet product specifications) or CAPA are not verified for regulatory or audit failures, Purine shall be responsible for paying for additional testing, up to two (2) times annually, until such time as the Parties mutually agree the Product meets specification.

In the event of a product recall or product withdrawal due to manufacturing defects, in addition to replacement of the defective product in full quantity, Purine is responsible for a reasonable administration handling fee, not to exceed $0.15 per each unit.

Purine shall be responsible for handling all customer quality complaints as well as any issues regarding expiration dates or defective/damaged products.

All samples pulled for testing or pulled during the manufacturing process for quality assurance shall be kept and preserved at Purine for at least one year after the expiration date of the lot of that product. The cost and expenses of preserving all test and quality assurance samples shall be the responsibility of Purine.

USE OF RETAILER TRADEMARK

7. All We Care supplied product specifications are the proprietary interest of We Care, are to be maintained in the strictest confidence by Purine, and are to be used by Purine solely for the purpose of preparing and packaging products under any We Care Trademark. Any and all Products bearing any We Care Trademark shall only be distributed to those entities designated by We Care. Purine will not at any time in any manner represent that it has ownership in any We Care Trademark. Upon termination of this Agreement in any manner provided herein, Purine will cease and desist from use of any We Care Trademark in any way and shall promptly deliver to We Care the logotype of any and all We Care Trademark(s) in its possession or within its control.

Purine shall not supply any of the We Care or WeZen brand labeled Products to any other party without We Care's express written permission.

INDEMNIFICATION

8. Purine agrees to defend, indemnify and hold We Care harmless from and against all losses, claims, costs and liabilities, including, reasonable attorney's fees, arising out of third party claims, including, without limitation, product liability claims, which result from any defect, alleged or real, in Products manufactured by Purine for We Care and We Care members and/or out of any acts, omissions, negligence or breach of this Agreement, and/or any violation of any law by Purine in the manufacturing, packaging, compounding, production of the Products except as a result of any such claims or losses resulting from any defects in the formulations or specifications provided to Purine by We Care. Purine shall not be obligated to We Care or any other party including We Care members under this indemnification to the extent that a claim is as a result of the negligence of We Care or any of its employees, agents or servants. We Care hereby agrees to notify Purine in writing of all complaints, claims or lawsuits within a reasonable period of time defined as three (3) business days after We Care or any of its distribution partners has received notice of said complaints, claims or lawsuits. We Care, agrees to cooperate and to cause any of its distribution partners to cooperate with Purine at Purine's expense in any regard in the investigation and defense of any claim or lawsuit covered by this indemnification. In the event of an Adverse Event Report by a customer, We Care is required to report full details including contact information, product name, and lot number of the affected party to Purine no later than 24 hours or in accordance with FDA guidelines, whichever is earlier.

INSURANCE

9. Purine agrees to carry General Liability coverage including Broad Form Vendors Coverage and Product Liability coverage in minimum amounts of FIVE MILLION DOLLARS ($5,000,000.00) per occurrence and FIVE MILLION DOLALRS in aggregate and upon request provide a copy of such insurance. The policy shall be underwritten by an insurance company that carries an A- or better rating from A.M. Best. Purine is responsible to notify We Care promptly being not less than thirty (30) days' prior written notice in the event of any alteration or terms of such policy or of the cancellation or non-renewal thereof. The amount and/or scope of such required insurance coverage under this section shall not limit Purine's obligations or liability under this Agreement.

TERM

10. This Agreement will be effective on the earlier of (i) the date Purine first commenced the process of developing for manufacturing a We Care product, should that date precede the date this Agreement is signed by both parties, or (ii) the date on which this Agreement is signed by both parties. This Agreement shall remain in full force and effect from year to year thereafter unless either party gives the other written notification of its intention to terminate this Agreement pursuant to Article 11 hereof.

TERMINATION

11. (a) This Agreement may be terminated by either party for any reason whatsoever upon ninety (90) days written notice to the other party. For any termination, We Care agrees to purchase, accept delivery of, and pay for saleable finished products and usable unused packaging and labeling and unusable raw materials for the Products manufactured by Purine for We Care pursuant to this Agreement which are in existence on the effective date of such termination, subject however to include all finished goods and an amount not to exceed six (6) months' supply of unique, unusable components and ingredients for a particular product package as set out in a particular Purchase Order. All prices shall be in accordance with the most recent invoice billed to We Care prior to the date of the termination notice. We Care shall not be responsible for purchasing any portion of components or ingredients ordered by Purine after the date of receipt by Purine of the notice of termination, if given by We Care to Purine.

(b) It is acknowledged by both parties to this Agreement that from time to time We Care may desire to modify the number and/or type of Products manufactured. Such a modification shall be in writing and signed by both parties hereto. In the event that We Care desires to have Purine cease manufacture of a particular Product or Products but not to terminate the entire Agreement, or, in the event Purine is unable to continue the manufacturing of a particular Product or Products, but does not desire to terminate the entire Agreement, either party shall give the other party thirty (30) days prior written notice of the termination of the manufacture of the particular Product or Products. We Care agrees to purchase, accept delivery of, and pay for saleable finished Products and unused packaging and labeling for the discontinued Product or Products in existence on the effective date of such termination, subject however to a limitation which shall not be greater than a six (6) month supply based on the average monthly product movement for the immediately preceding twelve (12) month period as set out in relevant Purchase Order(s). We Care shall not be responsible for purchasing any

Page 4 of 9

portion of minimum run if the minimum run is ordered by Purine after the date of receipt by Purine of the notice of termination, if given by We Care to Purine, or after the date of the notice of termination, if given by Purine to We Care.  Nothing contained in this Article 11(b) shall restrict the termination rights of each party contained in Article 11(a).

FDA REPORT

12. If applicable to the Products supplied under this Agreement, and specifically requested by We Care, Purine agrees that on the date that it shall execute this Agreement, it shall provide We Care with a copy of Purine's most current U.S. Food and Drug Administration (hereinafter "FDA") Inspectional Observation Form FD-483, Establishment Inspection Report or similar report (hereinafter "EIR"), if applicable, and Purine's responses to such FDA reports. In addition, Purine agrees that on an ongoing basis during the term of this Agreement it shall provide WE CARE with any updated EIR and Purine's response thereto within ten (10) days of the receipt by Purine of any such FDA issuance of an EIR We Care agrees that the results of any such EIR and responses shall be maintained in the strictest confidence by We Care  subject to the confidentiality and non-disclosure agreement outlined herein.

CONFIDENTIALITY AND NON-DISCLOSURE

13.1 Each Party (a "Recipient") hereby acknowledges and agrees that it will have access to, or become acquainted with, Confidential Information (as defined in Section 13.2 below) of the other party (a "Discloser"). Recipient hereby acknowledges that all Confidential Information is considered confidential by, and is exclusively proprietary to and a valuable trade secret of, Discloser and that Discloser derives independent economic value (actual or potential) from such Confidential Information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Confidential Information is the property of Discloser and shall not be used by Recipient in any way except in the performance of their respective obligations under this Agreement, and for the benefit of, Discloser. Both during and after the Term of this Agreement, Recipient will preserve as confidential all Confidential Information that has been obtained by Recipient. Recipient will not, without prior written authority from Discloser, use for Recipient's own benefit or purposes, or disclose to or use for the benefit of others, any Confidential Information or any materials which contain any Confidential Information. Recipient only may disclose Confidential Information to its Representatives (as defined in Section 13.3 below) who have a direct need to know such Confidential Information to assist in undertaking or performing the services or other obligations under this Agreement and who are bound in writing to use and hold in confidence the Confidential Information in a manner consistent with the obligations of Recipient under this Agreement. Upon Discloser's request, or in any event upon termination of this Agreement, Recipient promptly shall return or destroy and certify such destruction upon request to Discloser all Confidential Information (including any copies, summaries, extracts and other forms thereof) within its or any of its Representatives' possession or control.

3.2 For purposes of this Agreement, "Confidential Information" means any and all information (whether in human or machine readable form and whether or not developed by a Party or its Representatives) relating to Recipient's or its Representatives' management, finances, operations, business, network, infrastructure, personnel, customers, products, services and plans, including, without limitation, trade secrets, know-how, designs, formulations,

samples, processes, methods, specifications, techniques, research, development, processing, business partners, pricing of products and services, product handling strategies, new product information and related marketing plans or materials, scientific information, clinical development data, technology plans and designs, trademark and logo designs, internet site designs, software or computer applications, agreements and business terms with suppliers and customers and control information, product and service performance data, manuals, marketing information, requirements of customers and potential customers, customer and vendor lists, the results of the services performed hereunder and any other intellectual property. Notwithstanding the foregoing, the term "Confidential Information" shall not include any data or other information which: (i) has been made publicly available or otherwise placed in the public domain other than by Recipient or its Representatives in violation of this Agreement; (ii) is disclosed lawfully to Recipient by a third party having the right to disclose it without an obligation of confidentiality; or (iii) is required to be disclosed by Recipient by law or court order, provided that Recipient gives Discloser prompt written notice prior to making such compelled disclosure so that Discloser may seek a protective order or other appropriate remedy and further provided that Recipient discloses only that portion of the Confidential Information that is legally required to be disclosed.

   13.3 For purposes of this Agreement, "Representatives" means, with respect to any Party hereto, all of such Party's subsidiaries and affiliates and all of such Party's, subsidiaries' and affiliates' respective officers, directors, managers, employees, agents, consultants, and subcontractors.

   13.4 Each Party acknowledges that any and all notes, records, sketches, computer diskettes, research, marketing materials and related information and other documents relating to the other Party's Confidential Information obtained by or provided to Recipient, or otherwise made, produced or compiled during the term of this Agreement regardless of the type of medium in which they are preserved, are the sole and exclusive property of the Discloser and shall be surrendered to Discloser upon the termination of this Agreement.

   13.5 Each Party acknowledges that in the event of a breach of this Section 13, Discloser may suffer irreparable damage that may not be fully remedied by monetary damages, and therefore agree that Recipient shall be entitled to seek injunctive relief against any such breach in any court of competent jurisdiction without the requirement of posting a bond with respect thereto.

ASSIGNMENT

14. Neither this Agreement nor any of the rights or obligations of the parties hereunder shall be assigned or transferred by either party without the prior written consent of the other party.

AMENDMENT

14. This Agreement may be amended, modified or supplemented by written agreement signed by all of the parties hereto.

SUCCESSORS AND ASSIGNS

15. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

16. INTERNTIONALLY LEFT BALNK

GOVERNING LAW

17. This Agreement shall be interpreted in accordance with the laws of the State of Delaware, without giving effect to the conflict of law principles thereof. The parties hereby agree that any action, suit or proceeding arising out of or relating to the interpretation, enforcement or performance of this Agreement or any agreement or instrument contemplated hereby may be brought in the state or federal courts located in New York in the County of Westchester, and the parties hereby expressly consent to the jurisdiction of such courts for the purposes of any such suit, action or proceeding. The parties expressly waive any objection to personal jurisdiction in the courts described above, to venue being proper in those courts, and to those courts being an inconvenient forum.

SEVERABILITY

18. If any term or provision of this Agreement or the application thereof to any persons or circumstances shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

WAIVER

19. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as or be construed to be a waiver of any subsequent breach thereof.

ENTIRE AGREEMENT

20. This Agreement constitutes the entire understanding between We Care and Purine and shall not be altered or amended except in a writing signed by both parties. The undersigned

parties hereby agree that, in the event that any term, covenant or condition of this Agreement shall be inconsistent or in conflict with the Terms and Conditions of any Purchase Order signed by either or both parties, the terms, covenants and conditions of this Private Label Agreement shall supersede and be controlling in such instance.

HEADINGS -

21. The headings of the various Articles of this Agreement are inserted merely for the purpose of convenience and do not, expressly or by implication, limit, define or extend the specific terms of the Articles so designated.

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, each of the parties has caused this instrument to be executed on its behalf by its officers, duly authorized.

**PURINE:**

Purine Pharma, LLC.

BY: *[signature]*
NAME: Boyd P. Relac
TITLE: COO
DATE: 15 MAR 16

**WE CARE:**

We Care Distributor Inc.

BY:_____
NAME: Narender Kumar Patel
TITLE: PRESIDENT
DATE:

Page 8 of 9

# Schedule-A

| S.NO | WE CARE PRODUCT NAME | PACK SIZES |
|---|---|---|
| 1 | WeZen - Herbal Shot 5 Flavors-Reg-Grape, Strawberry, Fruit Punch, Peach Mango & Green Apple | 50ml |
| 2 | We Care NEPHROL PLUS: | 10ml |
| 3 | We Care NANO-D3: | 10ml |
| 4 | We Care NANO LAX: | 10ml |
| 5 | We Care Sleep Well Anti Snore Spray | 30ml |
| 6 | We Care Ear Relief Drops | 15 ml/ 0.5 oz |
| 7 | We Care Throat Spray Max-Travel Pack | 30 ml/ 1.0 oz |
| 8 | We Care Saline Nasal Spray | 45 ml/ 1,5 oz |
| 9 | We Care 12 hour Nasal Spray-Original | 15 ml/ 0.5 oz |
| 10 | We Care Adult & Children Natural Cough Syrup: Immune Support | 60 ml/ 2 oz |
| 11 | We Care Children's Allergy Liquid Medication | 120 ml/ 4oz |
| 12 | We Care Children's pain Relief Suspension -Grape | 60ml/ 2 oz |
| 13 | We Care Children's pain Relief Suspension -Cherry | 60 ml/ 2 oz |
| 14 | We Care Infant's pain Relief Suspension Drops-Grape | 15 ml/ 0.5 oz |
| 15 | We Care Infant's pain Relief Suspension Drops-Cherry | 15 ml/ 0.5 oz |
| 16 | We Care Children's pain Relief Suspension -Grape | 60ml/ 2 oz |
| 17 | We Care Children's pain Relief Suspension -Cherry | 60 ml/ 2 oz |
| 18 | We Care Infant's pain Relief Suspension Drops-Grape | 15 ml/ 0.5 oz |
| 19 | We Care Infant's pain Relief Suspension Drops-Cherry | 15 ml/ 0.5 oz |
| 20 | We Care Tussin DM | 60 ML/ 2 oz |
| 21 | We Care Daytime | 120 ml/ 4 oz |
| 22 | We Care Nite time-Original | 120ml/ 4 oz |
| 23 | We Care Stomach Relief Max | 120 ml/ 4 oz |